# In the United States Court of Federal Claims

No. 16-1264C
Filed: March 27, 2020

<table>
<tr><td>

**JOSIAH NICELY,**

               *Plaintiff,*

**v.**

**UNITED STATES,**

               *Defendant.*

</td><td>

**Keywords:** Military Pay Act, 37 U.S.C. § 204(a); Motion to Dismiss; Military Whistleblower Protection Act, 10 U.S.C. § 1034; Service Member Correction Boards; 10 U.S.C. § 1552(a)(1); Civilian; Ineffective Assistance of Counsel.

</td></tr>
</table>

*Charles W. Gittins*, Law Offices of Charles W. Gittins, P.C., Middletown, VA, for Plaintiff.

*Joseph A. Pixley*, Trial Attorney, *Douglas K. Mickle,* Assistant Director, *Robert E. Kirshman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, with whom were *Lt. P. Tyson Marx*, Judge Advocate General Corps, United States Navy, Washington D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER

**TAPP, Judge.**

Plaintiff, Josiah E. Nicely ("Nicely"), a former United States Marine Corps ("USMC") Captain, brings this military pay action against the United States alleging that he has been wrongly discharged from the USMC and seeking back pay and injunctive relief, pursuant to the Military Pay Act, 37 U.S.C. § 204(a). (*See generally* Compl., ECF No. 1). Nicely served on active duty in the USMC for more than ten years, until October 7, 2011, when he was involuntarily discharged. (Compl. at 1). Before the Court are Nicely's Motion for Judgment on the Administrative Record ("MJAR") following remand to the Board of Correction for Naval Records ("BCNR"), (Pl.'s Second MJAR, ECF No. 58), and Defendant, the United States', Partial Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record, (Def.'s Cross-Mot., ECF No. 61).

In his Complaint, filed on October 4, 2016, Nicely alleges that he was wrongly discharged from the USMC as a result of proceedings conducted by the BCNR. (Compl.). In these proceedings, the BCNR upheld the finding of the Board of Inquiry ("BOI") relating to the imposition of Nicely's non-judicial punishment (NJP) and concurred with the BOI's recommendation that Nicely be separated from the USMC with a General (Under Honorable Conditions) characterization of service. (*Id.*). Nicely argues that the findings and conclusions of the BCNR were arbitrary, capricious, and contrary to law because: (1) the Assistant Secretary of the Navy (ASN) considered grounds for separation for which Nicely was not provided prior notice and an opportunity to be heard; (2) Nicely's involuntary discharge was an adverse

personnel action prohibited by the Military Whistleblower Act; (3) Nicely was required to plead guilty and sign a stipulation of fact as a condition to imposing the NJP; and (4) the BCNR failed to remove an adverse fitness report concerning Nicely's removal as a Public Affairs Officer. (*Id.* at 14–17). Nicely seeks reinstatement to active duty, back pay, removal of documents from his Official Military Personnel File, and any other relief the Court deems just and proper. (*Id.* at 17).

On June 16, 2017, the Court remanded the case back to the BCNR to review several issues, such as whether regulations were complied with in conducting Nicely's separation from the USMC, whether a reprisal action was taken, whether one of Nicely's fitness reports was prepared properly, and whether the BOI improperly considered certain evidence. (ECF No. 15). On March 22, 2018, the BCNR decision on remand was filed with the Court. (ECF No. 31). On July 31, 2018, Nicely filed a Motion for Judgment on the Administrative Record. (Pl.'s First MJAR, ECF No. 45). On March 8, 2019, the Court again remanded the case to the BCNR to address Nicely's contention that the BCNR was improperly constituted by having retired military personnel sit on the board, rather than "civilians." (ECF No. 54). On June 24, 2019, the second BCNR decision on remand was filed with the Court. (*See* ECF No. 57). On July 30, 2019, Nicely filed his Motion for Judgment on the Administrative Record After Remand. (ECF No. 58). On October 1, 2019, the United States filed its Response and Partial Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record. (ECF No. 61). The parties timely filed their responses and replies. (*See* Pl.'s Resp. and Reply, ECF No. 62; Def.'s Reply, ECF No. 67). This matter is now fully briefed and ripe for decision.

For the reasons set for below, Nicely's motion is **DENIED** and the Government's motions are **GRANTED**. In addition, the Court **DENIES AS MOOT** Nicely's First Motion for Judgment on the Administrative Record, (ECF No. 45).

## Background[1]

Nicely originally enlisted in the USMC in 1997. (AR002). After an initial tour of service, the USMC discharged Nicely so he could attend the United States Naval Academy. (*Id.*). Following graduation, the USMC commissioned him as an officer where Nicely served without significant event until 2009, when the USMC issued a nonpunitive letter of caution relating to inappropriate online activity. (*Id.*).

On January 22, 2010, Nicely was arrested by local police in Beaufort, South Carolina, and charged with speeding and driving under the influence ("DUI").[2] (AR006; Compl. at 2). Upon his release from the jail the following morning, military police took custody of Nicely and transported him to Marine Corps Air Station (MCAS) Beaufort, where Nicely was stationed as a public affairs officer (PAO). (AR002). Because of these events, Nicely failed to report to work at his prescribed time. (AR205, AR064). Upon arrival, Nicely's superior sent him home on the belief that Nicely was still intoxicated and thus unable to perform his duties. (Pl.'s Second MJAR at 3; AR120). On or about February 8, 2010, Nicely was relieved of his duties as a PAO

---

[1] The facts recited in this Opinion are taken from the Administrative Record ("AR"); Nicely's Complaint; and the parties' briefs.

[2] The details of Nicely's arrest are not relevant to determination of the parties' claims.

and reassigned to training. (AR125). On March 4, 2010, local authorities reduced the DUI charge to Reckless Driving, to which Nicely pleaded guilty and paid a fine. (AR002; Compl. at 5).

Although his plea to Reckless Driving resolved his liability in the local proceedings, Nicely also faced consequences arising from his status as a member of the military. When Nicely was relieved of his duties as a PAO and reassigned to training with a different Reporting Senior (RS), the USMC began generating a fitness report that covered a period from August 4, 2009 to January 25, 2010 (the "January 25, 2010 Fitness Report"). (*See* AR302–11; Marine Corps Order P1610.7F, paragraph 3003(3)). Nicely received this fitness report on April 7, 2010, which was marked as "adverse" and stated: "During reporting period, MRO [Marine Reported On] was apprehended by civil authorities for alcohol related incident. This apprehension and demonstration of poor judgment caused a loss of confidence in abilities to perform duties as PAO." (AR135; AR302–11). A "directed comment" added that Nicely was "detained overnight." (AR306). After Nicely submitted a rebuttal statement alleging, *inter alia*, that command was prohibited from reporting the alcohol related incident in his fitness report until after his local proceedings were complete and that he was not intoxicated when he returned to military custody, the fitness report was returned to his chain of command several times to consider Nicely's allegations. (AR139, 146, 155, 538, 541).

On February 22, 2010, Nicely received a notification of intent to impose NJP based on one charge under the Uniform Code of Military Justice ("UCMJ"), Article 111 (driving under the influence of alcohol). (AR127).[3] Initially, on advice of both military and civilian counsel, Nicely refused to accept NJP for the conduct surrounding his arrest and instead demanded trial by court-martial.[4] (AR129; Compl. at 4). On March 22, 2010, the USMC preferred formal court martial charges against Nicely for violations of UCMJ Article 89 (failure to report), Article 111 (driving under the influence of alcohol), and Article 112 (drunk on duty). (AR135–36). Eventually, Nicely reversed course and, on March 17, 2010, notified the Staff Judge Advocate that he was willing to accept NJP in lieu of a court martial, if offered again. (Pl.'s MJAR at 5; AR263–64; AR300). Following the Article 32 pre-trial hearing on Nicely's court-martial charges, Nicely again offered to accept NJP in lieu of a court-martial, which was rejected. (AR266). However, after Nicely was arraigned on these charges, Nicely was offered an NJP, instead of a court-martial, conditioned on Nicely's pleading guilty to all charges and submitting a stipulation of fact acknowledging guilt to all charges. (AR267).

Thereafter, Nicely, on advice of both military and civilian counsel, entered into a formal pre-trial agreement in which the USMC agreed to dismiss the court martial charges, with prejudice, if Nicely agreed to sign a stipulation of fact detailing the circumstances of his arrest

---

[3] During this time and as a result of the DUI charge, Nicely's base driving privileges were temporarily suspended pursuant to Air Station Order P5110.1F, Chapter 5, paragraph 5000.4. (AR120). Nicely appealed this suspension without success. (*See* AR133).

[4] NJP is one of the options available to address offenses committed by service members. *Dumas v. United States*, 620 F.2d 247, 250–53 (Ct. Cl. 1980). Set out in Article 15 of the UCMJ, the non-judicial punishment process is the least formal option and is conducted by the accused's commanding officer. *Id.* at 251. The proceeding is not criminal in nature and no formal evidentiary standards apply. *Id.* If the commanding officer is convinced that the service member committed the offense, the commanding officer may impose certain limited punishments. *Id.* at 251–52. An accused service member has the right to elect to proceed with an NJP instead of with a formal court martial. *Id.* at 251; *see also* 10 U.S.C. § 815.

and plead guilty at an NJP proceeding to three offenses under the UCMJ: unauthorized absence, driving under the influence, and drunk on duty. (AR62–63, 317–18). Nicely signed the pre-trial agreement on May 18, 2010, which certified, *inter alia*, that: (1) he voluntarily entered pleas of guilty to the three UCMJ charges; (2) he fully understood the offer and agreement; (3) he could seek to withdraw his guilty plea at any time before punishment; (4) his counsel fully advised him of the meaning and effect of his guilty plea and he fully understood and comprehended the meaning, effect, and consequences of his plea; and (5) he must enter into a reasonable stipulation of fact. (AR62–63). In accordance with this agreement, Nicely and his lawyers drafted the stipulation of fact, in which Nicely admitted he "failed to go to his appointed place of duty at the time prescribed" and "operated his passenger car while drunk." (AR317–18; AR378). Nicely also stipulated that he "was unfit to perform [his] duties because of the amount of alcoholic beverages he had consumed earlier that morning," and "under such circumstances, [his] conduct was to the prejudice of good order and discipline and was of a nature to bring discredit upon the service." (AR318).

On May 28, 2010, the Commanding General approved the pre-trial agreement and dismissed the court-martial charges without prejudice, rather than with prejudice. (AR142). On June 3, 2010, Nicely signed the first endorsement on the notification of the Commanding General's intent to impose NJP, stating that he would accept NJP and no longer demanded trial by court-martial. (AR143, 629). On June 9, 2010, prior to the NJP hearing, Nicely wrote to the Commanding General accepting responsibility for his actions:

> Simply stated, I drove while intoxicated in Beaufort, South Carolina on Friday, 22, January 2010. I had been drinking at a local bar, and when it came time to leave, I thought I was fine to drive home when in fact I was not. It was a stupid mistake, and I regret it immensely. I made a decision that endangered the safety of others, and for that I am truly sorry.

(AR388).

The NJP proceeding was held on June 9, 2010. (AR321). At the hearing, Nicely stated that: (1) he did not desire a personal representative; (2) he understood his rights; (3) he did not desire trial by court-martial and was willing to accept NJP; (4) he had been fully advised of his legal rights pertaining to the NJP hearing; and (5) he did not have any questions about his rights. (AR321). After discussing the factual circumstances underlying the UCMJ charges, the Commanding General repeatedly expressed impatience with what he perceived to be Nicely's refusal to accept responsibility for his conduct. The Commanding General noted that Nicely's statements and conduct between the arrest and NJP hearing were markedly different than what was presented in Nicely's June 9 letter, and explained "[a]s officers, particularly as commissioned officers, we are all expected to take immediate responsibility for what we do or do not do . . . you did not do the right thing and when you were caught red handed you looked for a way out." (AR330). Ultimately the Commanding General imposed NJP, consisting of a punitive letter of reprimand and a fine of $1,500 pay per month for two months. (AR329–30). The Commanding General also explained that he would recommend that Nicely be required to show cause to a Board of Inquiry (BOI), stating:

> You were playing games with the system. You were playing games with your commander. You were playing games with me. That is not in consonance with the behavior that is expected as an officer in the United States Marine Corps . . . you just . . . got done telling me you perjured yourself with this note on 9 [June] which concerns me, which is why you are going to show cause.

(AR330–31).

The completion of Nicely's NJP proceeding triggered a "Directed by the Commandant of the Marine Corps" DC fitness report ("DC fitness report"). (AR356–65; Marine Corps Order ("MCO") P1610.7F, paragraph 3004(2)). This report was also "adverse." (AR356). On July 8, 2010, Nicely submitted a rebuttal statement to his punitive letter of reprimand and a rebuttal statement to the DC Fitness Report. (AR345; AR370). Among other allegations, Nicely alleged that he signed the stipulation of facts "under duress imposed by [his] command." (AR370–72). Nicely later clarified that "the word [duress] was not meant to imply that any person . . . communicated direct threats against me in order to force my signing of the stipulation of fact," but rather "[o]verwhelming, multi-tiered levels of undue pressure to comply with and succumb to pleading guilty and entering into a stipulation of fact . . . If I had not signed the stipulation of fact, NJP would not have been an option." (AR152). A resulting investigation by the Inspector General ("IG") did not substantiate Nicely's claim of duress. (AR367).

On August 16, 2010, Nicely submitted a request for leave, starting at noon that day and ending on August 18, 2010. (AR153). Nicely was scheduled to talk with the Command IG regarding his duress comments the afternoon of August 18, 2010 but did not return from his leave in time and missed the interview. (AR153). Nicely received a non-punitive letter of caution for this incident. (AR155). Nicely formally appealed his NJP on September 3, 2010, seeking to have the Punitive Letter of Reprimand removed from his personnel file and that the NJP be set aside as unjust and disproportionate to the offenses. (AR155–57). That appeal was denied on November 18, 2010. (AR155–57; AR601).

On November 18, 2010, Nicely was notified that he was being required to show cause at a BOI based on substandard performance of duty and misconduct, moral or professional dereliction. (AR392). The notification stated that these bases for separation were evidenced by "[c]omission of a military or civilian offence which could be punished by 6 months or more," "[f]ailure to properly discharge duties expected of officers of the member's grade and experience," and "[f]ailure to demonstrate acceptable qualities of leadership required of an officer of the member's grade." (AR392; AR589–90). The letter also referred to Nicely's NJP report, an email concerning Nicely's unauthorized absence from work on August 18, 2010, and the IG report into Nicely's inappropriate comments on a public blog, which resulted in a non-punitive letter of caution (NPLOC). (AR392; Pl.'s Second MJAR at 12–13).

The BOI convened from January 12–13, 2011. (AR159; AR446). The BOI reviewed the evidence and heard arguments from both the Government and Nicely, who took the stand and answered questions under oath. (AR446–86). Ultimately, the BOI determined that "[w]ith the exception of a failure to properly discharge the duties expected of an officer of his grade and experience, . . . a preponderance of the evidence proved the allegations," and recommended that

Nicely be separated with a general (under honorable conditions) discharge. (AR486, 590). Nicely provided a rebuttal to the BOI report to the Deputy Commandant (Manpower & Reserve Affairs), which raised a litany of challenges, including that the BOI improperly considered Nicely's "protected communications" to the IG and reprised against Nicely for exercising his rights to appeal. (*See* AR436–39).

On February 17, 2011, Nicely submitted a Military Whistleblower Protection Act (MWPA) reprisal complaint to the Department of Defense IG hotline, which the Marine Corps IG was tasked with investigating. *See* 10 U.S.C. § 1034; (AR159). The IG found that "Capt Nicely committed misconduct that was punishable under the UCMJ prior to any [protected communication]. The supporting documentation shows the command's intent to take corrective action under the UCMJ in response to the misconduct. Capt Nicely may perceive this action as reprisal, but the evidence demonstrates it was not." (AR164). The IG then analyzed all eleven instances in which Nicely felt unfavorable personnel action was taken against him and concluded that no unfavorable actions were taken against Nicely for exercising his rights to appeal. (AR165–171).

On April 26, 2011, the Commanding General Marine Corps Installations East ("CG MCI-E"), addressed the challenges set forth in Nicely's rebuttal, found them to be without merit, and ultimately approved the BOI's recommendation to separate Nicely with a general (under honorable conditions) characterization of service. (AR430–34; AR590). On May 4, 2011, the Commanding General of Marine Corps Bases Atlantic concurred with the CG MCI-E and forwarded the matter to the Commandant of the Marine Corps, who agreed that Nicely's concerns were without merit. (AR573; AR575–76). On August 30, 2011, the Assistant Secretary of the Navy for Manpower and Reserve Affairs ("ASN (M&RA)"), approved the BOI's recommendation for separation. (AR576). On October 7, 2011, the USMC discharged Nicely with a General (Under Honorable) characterization of service. (AR192).

On November 4, 2012, after his involuntary separation, Nicely filed an application for correction of his military record with the BCNR, in which he challenged several aspects of his various military proceedings and involuntary separation. (AR244–58). In his application, Nicely requested that the BCNR correct his military record by: (1) directing the removal of the January 25, 2010 Fitness Report; (2) setting aside Nicely's administrative separation from the USMC for misconduct, as well as the BOI decision that led to that separation; (3) reinstating Nicely to active duty and providing back pay; and (4) ordering such additional relief as may be required to afford adequate relief. (AR258).

On December 6, 2013 and February 13, 2015, the Judge Advocate Division provided advisory opinions to the BCNR, in which it opined that Nicely did not present evidence to show the existence of probable material error or injustice with respect to his separation from the Marine Corps. (AR205; AR175). In addition, the BCNR obtained advisory opinions from the Performance Evaluation Review Board with respect to Nicely's request to remove the January 25, 2010 Fitness Report. (AR224; AR222). The Performance Evaluation Review Board stated that Nicely's record was correct because "[t]he report was occasioned by [Nicely's] relief for a loss of trust and confidence because of an incontrovertible incident of arrest by civilian authorities involving alcohol, and the necessity to relieve him of his sensitive billet as the Public Affairs Officer (PAO)." (AR224).

On August 13, 2015, the BCNR found that the arguments and evidence submitted by Nicely were insufficient to establish the existence of material error or injustice and therefore denied Nicely's petition for relief. (AR194). On October 4, 2016, Nicely filed suit in this Court. (*See* Compl.).

On June 16, 2017, the Court remanded Nicely's case to the BCNR for additional review. (ECF No. 15). Specifically, the Court remanded the case for the BCNR to, *inter alia*: (1) review Nicely's record to determine if regulations were complied with in conducting his separation and state how the IG report factors into the BCNR's decision relating to Nicely's allegation that his separation was a reprisal action; (2) determine whether the ASN M&RA action involuntarily separating Nicely was in accordance with applicable regulations; and (3) consider, comment upon, and/or correct any substantive claim of regulatory violations related to the January 25, 2010 Fitness Report, submission and inclusion in the BOI of a NPLOC, and the consideration and use of Nicely's allegedly protected statements. (*See* ECF No. 15).

On March 20, 2018, the BCNR determined that the evidence Nicely submitted was "insufficient to establish the existence of probable material error or injustice" and accordingly recommended that the ASN deny Nicely relief. (ECF No. 31). Specifically, the BCNR found that "the Marine Corps, DC (M&RA), and ASN (M&RA) did not unlawfully retaliate against [Nicely]," that "there was an independent basis for the actions identified as unauthorized personnel actions (UPAs) and that there was no indication that any actions occurred as a result of what [Nicely] considered to be protected communications." (ECF No. 31 at 8). Further, the BCNR determined that consideration of the NPLOC by the BOI was harmless error because the facts underlying the NPLOC were already properly part of the record. (*Id.* at 11). Finally, the BCNR found no error with respect to the January 25, 2010 Fitness Report or the NJP proceedings. (*Id.* at 5–6, 12).

On December 12, 2018, the Court again remanded the case to the BCNR, this time to consider Nicely's claim that retired military members are precluded from sitting on military correction boards under 10 U.S.C. § 1552(a).[5] (*See* ECF No. 52). On April 29, 2019, a three-member panel of the BCNR with no previous military service considered the case again. (ECF No. 57 at 3). The BCNR found that none of the provisions in the BCNR's authorizing statute and governing regulations "expressly define 'civilian,' and thus do not expressly exclude retired military members from those civilians who may serve as Board members." (*Id.* at 3). The Board also "noted not only the longstanding practice of all Services allowing these individuals to serve, but also the practical, administrative problems associated with barring retired military members from service on these Boards, as many, if not a majority, of the BCNR's members are retired military." (*Id.*). The BCNR further explained that "[b]ecause Congress, in section 1552, did not expressly exclude retired Service member employees from those 'civilians' comprising the correction boards, . . . it is more likely that Congress intended the term's common, everyday meaning—that is, those 'not serving on active duty in the military.'" (*Id.* at 4). Ultimately, the BCNR determined that "the use of retired military members was not in error or unjust," and denied Nicely's application for relief. (*Id.*).

---

[5] Nicely's claim in this regard was first raised in his rebuttal letter to the BCNR in connection with the first remand. (*See* Def.'s Mot. at 20).

**Analysis**

## I.        RCFC 12(b)(1) Motion to Dismiss

"Subject-matter jurisdiction may be challenged at any time by the parties or by the court *sua sponte.*" *Folden v. United States*, 379 F.3d 1344, 1354 (Fed. Cir. 2004) (citing *Fanning, Phillips & Molnar v. West*, 160 F.3d 717, 720 (Fed. Cir. 1998)). This Court's jurisdiction to entertain claims and grant relief depends on the extent to which the United States has waived sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976). The burden of establishing the Court's subject matter jurisdiction rests with the plaintiff. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

This Court's jurisdiction is generally delimited by the Tucker Act, 28 U.S.C. § 1491. The Tucker Act limits this Court's jurisdiction to suits "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon and express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a). The Tucker Act itself is only a jurisdictional statute that does not create any independent substantive rights enforceable against the United States for money damages. *See, e.g.*, *United States v. Mitchell*, 463 U.S. 206, 216 (1983); *United States v. Testan*, 424 U.S. 392, 398 (1976). Therefore, a plaintiff must identify a "money-mandating" source of law to support a claim for money damages. *See Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008). If the claim is not based on a "money-mandating" source of law, then it lies beyond the jurisdiction of this Court. *Metz v. United States*, 466 F.3d 991, 997 (Fed. Cir. 2006).

When faced with a motion to dismiss for lack of subject matter jurisdiction, pursuant to RCFC 12(b)(1), the court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the plaintiff's favor. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *see also Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995). The movant, however, may challenge the truth of any facts upon which jurisdiction depends. *See Raymark Indus. v. United States*, 15 Cl. Ct. 334, 338 (1988). If it does, the plaintiff must come forward with a prima facie showing of jurisdiction. *Id.* The plaintiff cannot rely only on its allegations. *See Hornback v. United States*, 52 Fed. Cl. 374, 377 (2002).

Controverted factual allegations may be subject to factfinding by the court and may be established by extrinsic evidence including affidavits and deposition testimony. *Cedars-Sinai Medical Centers v. Watkins*, 11 F.3d 1573, 1584 (Fed. Cir. 1993); *Reynolds v. Army & Air Force Exchange Serv.*, 846 F.2d 746, 747–48 (Fed. Cir. 1988). The party seeking to invoke the Court's jurisdiction must establish disputed jurisdictional facts by a preponderance of the evidence. *Taylor v. United States*, 303 F.3d 1357, 1358 (Fed. Cir. 2002).

Military discharge and pay claims pursuant to 37 U.S.C. § 204 are generally within the jurisdiction of the Court of Federal Claims. *See Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (*en banc*).[6] Nicely also contends, however, that the United States violated the

---

[6] "The Tucker Act generally covers Military Pay Act claims where the plaintiff alleges that "because of the unlawful discharge, the plaintiff is entitled to money in the form of the pay that the plaintiff would have received but for the unlawful discharge." *Rana v. United States*, 664 Fed. Appx. 943, 947 (Fed. Cir. 2016) (citing *Martinez v. United*

Military Whistleblower Protection Act (MWPA) by involuntarily separating him from service based largely upon what Nicely claims were protected communications. (Compl, at 15, ECF 1). The United States, in response, correctly notes that the MWPA is not a money-mandating statute and thus argues that the Court lacks jurisdiction to entertain Count II of Nicely's Complaint. The Court agrees.

The Federal Circuit has considered whether a violation of the MWPA can serve as the basis for a cause of action in this Court and found that it does not. *See Bias v. United States*, 722 Fed. Appx. 1009, 1013 (Fed. Cir. 2018); *Rana v. United States*, 664 Fed. Appx. 943, 947 (Fed. Cir. 2016) (affirming dismissal of MWPA claim for lack of jurisdiction). Specifically, the Federal Circuit determined:

> The MWPA provides for a comprehensive administrative review scheme over claims of retaliation—specifically, the correction of military records and disciplinary actions as remedies for prohibited actions—but no private right of action for money damages, which could be enforced in the Court of Federal Claims. Indeed, no judicial review is available under the MWPA because Congress precluded alternative fora by providing a specific form of redress in the statute.

*Bias*, 722 Fed. Appx. at 1013. Thus, under Federal Circuit precedent, this Court lacks jurisdiction to resolve MWPA claims, such as Nicely's standalone claim as pleaded in Count II.[7] *Id.*; *Rana*, 664 Fed. Appx. at 947. Although Nicely relies on other cases to support his position, none of those cases are precedential in this Court or particularly analogous to the facts at hand.

For example, in *Hisgen v. Fanning*, 208 F.Supp. 3d 186 (D.D.C. 2016), an officer brought an action against the Secretary of the Army seeking to overturn a decision of the Army Board for Correction of Military Records, which confirmed that the officer violated the MWPA by reprising against a lieutenant colonel who made a protected communication. Although the court determined that a violation of the MWPA occurred, there was no occasion to consider whether that violation was "money-mandating" because that court was not constrained by the limitations of the Tucker Act. *See id.* at 197–200.

---

*States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (*en banc*)). Jurisdiction to hear such cases, however, may be constrained by other matters such as statutes of limitation. *See* 28 U.S.C. § 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."); *see also John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008) (holding that § 2501 is jurisdictional).

[7] Nicely inexplicably contends that he "neither explicitly or implicitly alleged the [MWPA] as the jurisdictional basis for his claim, nor did he claim that the MWPA was a money mandating statute." (Pl.'s Resp. and Reply at 4). Despite invoking the Tucker Act at the outset of the Complaint, Count II invokes the MWPA no less than three times in the caption and three paragraphs which comprise Count II. (Compl. at 15). Fairly read, Count II seeks to state a cause of action under the MWPA. That conclusion is supported by a reading of Section IV of Nicely's motion seeking judgment on the administrative record. (Pl.'s Second MJAR at 21–31; *see also* Pl.'s First MJAR, ECF No. 45 at 20–30). Nicely's argument commences with the MWPA concludes with a plea for remand to the BCNR with instructions to apply the MWPA and implementing regulations to Nicely's claims. (Pl.'s Second MJAR at 31).

Likewise, Nicely's reliance on *Rodriguez v. Penrod*, 857 F.3d 902 (D.C. Cir. 2017), is misplaced. *Rodriguez* addressed whether a service member could directly appeal an adverse decision by a board of review by filing with the appellate court. *Id.* at 903. Ultimately, the D.C. Circuit remanded the matter to the district court. *Id.* at 907. At the outset of its opinion, however, the circuit court noted an important point relevant here:

> We begin, as we must, "with the question of our jurisdiction." Jurisdiction in the federal courts of appeals hinges on two things: "[t]he Constitution must have given to the court the capacity to take [the case], *and an act of Congress must have supplied it*." Rodriguez indisputably has been personally and directly aggrieved by the Defense Department's decision on his claim, so the question in this case is one of statutory, not constitutional, jurisdiction. That predicate statutory inquiry is essential to our power to decide this case: "without statutory authorization," "federal courts have no jurisdiction."

(*Id.* at 906) (citations omitted) (emphasis in original).

While *Hisgen* and *Rodriguez* certainly involved MWPA claims, neither of those cases are binding on this Court. Moreover, because the *Hisgen* and *Rodriquez* courts were not constrained by the limitations of the Tucker Act, there was no occasion for those courts to consider whether a violation of the MWPA was "money-mandating." Under Federal Circuit precedent, however, "no judicial review is available under the MWPA," *Bias*, 722 Fed. Appx. at 1013, and the MWPA is not money mandating, *Rana*, 664 Fed. Appx. at 948.[8] Accordingly, since no statutory authorization exists for judicial review of the MWPA and the MWPA is not money mandating, dismissal of the standalone claim contained within Count II of Nicely's Complaint, pursuant to RCFC 12(b)(1), is proper.

## II.    RCFC Rule 52.1 Motion for Judgment on the Administrative Record

Where the parties have filed cross-motions for judgment on the administrative record, as here, RCFC 52.1 provides a procedure for parties to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005). Unlike summary judgment standards, genuine issues of material fact do not preclude a judgment on the administrative record. *See id.* at 1355–56. Questions of fact are resolved by reference to the administrative record. *Id.* at 1356.

In reviewing the determinations of a military corrections board, a plaintiff must demonstrate "by cogent and clearly convincing evidence," *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986), that the military board's decision was "arbitrary, capricious, unsupported by substantial evidence, or contrary to law." *Metz*, 466 F.3d at 998. It is well settled that "responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." *Heisig v.*

---

[8] Because the Court considers the absence of judicial review from the MWPA statute to be an adequate expression of legislative intent, coupled with unambiguous case law applying the MWPA, the Court does not address the United States' contention that the legislative history demonstrates that Congress did not intend to provide for judicial review.

*United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (citations omitted). Moreover, "military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs." *Dodson v. United States*, 988 F.2d 1199, 1204 (Fed. Cir. 1993).

Here, both parties moved for judgment on the administrative record. Nicely presents four claims of error. First, he alleges that the composition of the original BCNR was improper because some of the individual members were retired military officers. (Pl.'s Second MJAR at 16–21). Second, Nicely contends that his discharge from service was facilitated using protected communications and thus violated the MWPA. (*Id.* at 21–31). Third, Nicely, claims the BCNR erred in concluding that Nicely's January 25, 2010 Fitness Report was procedurally correct and thus properly considered. (*Id.* at 32–38). Lastly, Nicely argues that his NJP and forfeiture of pay was improper. (*Id.* at 38–46). Nicely's second argument, involving the MWPA, is resolved above. Each of the remaining claims are addressed separately.

### a. Service of Retired Military Members on the BCNR

The enabling legislation for Service Record Correction Boards provides, in relevant part:

> The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice. Except as provided in paragraph (2), such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department.

10 U.S.C. § 1552(a)(1). It is the term "civilians," used in the second sentence of the statute, which Nicely focuses on.

According to Nicely, retired military officers are not "civilians" and therefore, his original BCNR panel, which contained three retired military officers, was improperly constituted and its decision must be set aside. (*See* Pl.'s Second MJAR at 16–21). The BCNR addressed this contention and found it to be without merit, stating "read in context, the meaning of 'civilian' in section 1552(a)(1) plainly includes retired Service members." (ECF No. 57 at 3).[9] The BCNR explained that "[b]ecause Congress, in section 1552, did not expressly exclude retired Service member employees from those 'civilians' comprising the correction boards, . . . it [is] more likely that Congress intended the term's common, everyday meaning—that is, those 'not serving on active duty in the military.'" (*Id.* at 3–4). After review, the Court does not find the BCNR's decision in this regard to be erroneous.

When reviewing an agency's interpretation of a statute, the Court must first determine "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If Congress has spoken directly on the question, then the inquiry ends and the Court "must give effect" to Congress's unambiguous intent. *Id.* at 842–43. The Court may determine that Congress has expressed unambiguous intent

---

[9] The Court remanded the matter back to the BCNR for the second time in light of the United States' consent motion, (ECF No. 51), which noted that Nicely "arguably" raised this issue before the original BCNR panel, but the panel failed to reach a decision on the merits.

by reviewing "the statute's text, structure, and legislative history, and apply[ing] the relevant canons of interpretation." *Gazelle v. Shulkin*, 868 F. 3d 1006, 1010 (Fed. Cir. 2017) (quoting *Heino v. Shinseki*, 683 F.3d 1372, 1378 (Fed. Cir. 2012)). If Congress has not spoken directly on the question at issue, the Court considers "whether the agency's [interpretation] is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The agency's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229–230 (2001)).

Here, as the BCNR correctly noted, the term "civilians" is not expressly defined in the BCNR's authorizing statute and governing regulations. *See* 10 U.S.C. § 1552; (ECF No. 57 at 3). Thus, Congress has not spoken directly on the question at issue. Accordingly, the Court must determine whether the BCNR's interpretation of the term "civilian," which it found "plainly includes retired Service members," is based on a permissible construction of the statute. *See Chevron*, 467 U.S. at 843; (ECF No. 57 at 3). As explained below, the Court finds that the BCNR's interpretation is based on a permissible construction of the statute.

Interpretation of a statute "begins with the language employed by Congress." *Gazelle*, 868 F.3d at 1010. "In the absence of an express definition, we presume that Congress intended to give . . . words their plain and ordinary meanings." *Id.* at 1010–11 (citing *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995)). Ordinary meaning "may be informed through the use of dictionaries." *Id.* at 1011 (citing *United States v. Rodgers*, 466 U.S. 475, 479 (1984)). If Congress intended for a term "to carry a specialized—and indeed, unusual—meaning," they "would have said so expressly." *Hamilton v. Lanning*, 560 U.S. 505, 517 (2010). Further, it is axiomatic that "identical words used in different parts of the same act are intended to have the same meaning." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) (citations omitted).

Dictionaries generally define the term "civilian" as "one not on active duty in the armed services." *See, e.g.*, *Civilian, Merriam-Webster*, https://www.merriam-webster.com (March 26, 2020); *Webster's New World College Dictionary* (4th ed. 2010) ("any person not an active member of the armed forces); *Oxford English Dictionary* (2d ed. 1989) ("A person who is not professionally employed in the armed forces; a non-military person"); *Black's Law Dictionary* (11th ed. 2019) ("A person not serving in the military). These definitions differentiate between persons "on active duty in the armed services" and those who are not, which is consistent with how the terms "member[s] of the armed forces," and "active duty" are defined in Title 10 of the United States Code.

In Title 10, the term "member[s] of the armed forces" is defined as: "(A) a member of the armed forces who is serving on active duty, (B) a member of the National Guard who is serving on full-time National Guard duty, or (C) a member of a Reserve component while performing inactive-duty training."[10] 10 U.S.C. § 976(a)(1). Title 10 also defines the term "active duty" as meaning "full-time duty in the active military service of the United States." 10 U.S.C. § 101(d)(1). Together, these definitions support the BCNR's conclusion that the term "civilian" "plainly includes retired Service members." As the very name suggests, a "retired service member" is not on "active duty," or a member of the National Guard or Reserve component. And

---

[10] This statute deals with membership in military unions.

there is no indication that Congress intended the term "civilian" to carry a specialized or unusual meaning. *See Hamilton*, 560 U.S. at 517.

Furthermore, as the United States observes, elsewhere in Title 10, Congress differentiated between "civilians" and members of the military. For example, Title 10 prohibits appointment of the Secretary of Defense from "civilian life," subject to the qualification that he or she not be appointed "within seven years after relief from active duty as a commissioned officer from a regular component of the armed force." 10 U.S.C. § 113(a). Similar qualifiers exist for the Secretaries of the Navy and Army. *See* 10 U.S.C. §§ 5013(a), 7013(a) (providing for appointment from "civilian life" and imposing five-year qualifier after relief from active duty). Congress imposed similar restrictions to the appointment from "civilian life" of judges to the United States Courts of Appeal for the Armed Forces.[11] *See* 10 U.S.C. § 942(b)(1), (b)(2)(B)(4) (prohibiting appointment of judges within seven years after retirement from active duty). Thus, it was reasonable for the BCNR to conclude that Congress intended the term "civilian" to have an ordinary meaning that includes former and retired military members.

The BCNR's interpretation is also not precluded by case law as no published case has expressly defined the term "civilian" in the context of § 1552. While Nicely relies principally on *Proper v. United States*, 154 F.Supp. 317 (Ct. Cl. 1957), and *Weiss v. United States*, 408 F.2d 416 (Ct. Cl. 1969), neither case lends credence to the argument that retired service members are prohibited from serving on boards of correction.[12] As the Federal Circuit has explained, the point of those cases is that "Congress wanted final decisions on records corrections to be made by civilians in each military department, not uniformed officers." *Strickland v. United States*, 423 F.3d 1335, 1342 (Fed. Cir. 2005).

In *Proper*, a retired Army general serving as a special assistant to the Secretary of the Army, sent a memorandum to the Assistant Secretary, advising the Secretary to reject the correction board's recommendation to grant relief for service-connected disability. *See Proper*, 154 F.Supp. at 324–26. When the Secretary followed the advisor's advice and rejected the Board's recommendation, the issue became whether final authority over the correction of records vested with the Secretary or with the correction boards. *Id.* at 326. The Court of Claims held:

> In the instant case the Secretary of the Army, in denying plaintiff's application for correction of his military record, did not act through the Army

---

[11] In this regard, Nicely states "[a]n active military retiree who is not on active duty is in 'civilian life'" before contradicting himself three sentences later by saying "[a]ctive duty retired military members are part of the military service." (*See* Pl.s' Resp. at 13). Adding to the confusion, in the paragraph following these sentences, Nicely states "[f]ormer military personnel who have separated are not members of the military service, nor are retired Reserve military officers. They are removed from their military service and, as such removed from life-long active duty…." (*Id.*). As such, it is unclear how Nicely distinguishes between "civilians" and "members of the military service."

[12] Nicely's also relies on *dicta* from a plethora of other cases, which similarly provide no support for his position as they address narrow issues of military retired pay, the now-repealed prohibition on dual office holding, and court-martial jurisdiction of former military members. (*See* Pl.s' Second MJAR at 20–21) (citing *United States v. Tyler*, 105 U.S. 244 (1881) (military retired pay), *Hotinsky v. United States*, 154 Ct. Cl. 443 (1961) (dual office holding), *Lemly v. United States*, 75 F.Supp. 248 (Cl. Ct. 1948) (military retired pay), *McCarty v. McCarty*, 453 U.S. 210 (1981) (division of military nondisability pay following divorce), and *United States v. Dinger*, 76 M.J. 552 (N-M. Ct. Crim. App. 2017) (court-martial)).

> Board of civilian officers or employees as required by [10 U.S.C. § 1552].
> On the contrary, the Secretary of the Army wholly disregarded the finding of
> the civilian board that plaintiff had been totally and permanently disabled in
> line of duty at the time of his release to inactive duty on April 27, 1948, and,
> apparently acting through a retired regular Army officer, refused to correct
> plaintiff's record in the manner recommended by the civilian board.

*Id.* Thus, the reference to the retired general as a member of the military was not essential to resolution of the precise pending issue before the court, which involved the role of the corrections board. *See id.* at 326–27.

Similarly, in *Weiss*, a Judge Advocate General (JAG) of the Navy, a uniformed military officer, drafted an advisory opinion on behalf of the Assistant Secretary recommending that the Secretary of the Navy reject the BCNR's decision recommending correction of a service member's records. *Weiss*, 408 F.2d at 417–18. The Assistant Secretary submitted the opinion, as written, to the Secretary who endorsed the opinion and overruled the BCNR. *Id.* at 420–21. The Court of Claims determined that the Secretary's rejection of the BCNR's recommendation was unjustified because the recommendation was fully supported by the record and the Secretary had, instead, followed the advice of a military officer. *Id.* The court also explained that: "[t]he thrust of the *Proper* opinion is that a Secretary of a military department cannot overrule the recommendations of a civilian correction board on the advice of a military officer unless the findings of the board are not justified by the record before it." *Id.* at 421.

In *Strickland*, the Federal Circuit discussed both *Proper* and *Weiss* in deciding whether final decision-making authority over the correction of military records vested with the boards of correction or with the Secretary. *Id.* at 1336, 1341–42. The Federal Circuit explained that the point of those cases is simply that "Congress wanted final decisions on records corrections to be made by civilians in each military department, not uniformed officers." *Id.* at 1343. Notably, *Strickland* did not say that "Congress wanted final decisions on records corrections to be made by civilians, *not those who had been* uniformed officers."

Thus, Nicely's reliance on *Proper* and *Weiss* is misplaced. These cases do not address whether retired service members can serve on correction boards but rather, whether the Secretary of a military branch may disregard the substantiated and well-reasoned findings of the corrections board based on the advice of uniformed military officers. Congress has not expressly spoken on what it means to be a "civilian" in the context of 10 U.S.C. § 1552, and the BCNR interpreted the term based on a permissible reading of the statute. *See Chevron*, 467 U.S. at 843. Therefore, the BCNR did not act contrary to law or regulation by allowing retired military members to serve as Board members.

### b. BCNR's Use of Contested Fitness Report

Nicely next contends the BCNR's conclusion that the January 25, 2010 Fitness Report was "administratively and procedurally correct" was contrary to regulation. (Pl.'s Second MJAR at 32). This report, covering a period from August 4, 2009 to January 25, 2010, was issued on April 7, 2010, while court-martial charges were pending, and reported that Nicely had been apprehended by civilian law enforcement and "detained overnight for an alcohol related

incident." (AR302–311). Principally, Nicely contends the report should not have referenced his apprehension by local authorities for an alcohol related incident because, according to Nicely, MCO P1610.7F ¶ 4003c(1) provides "[w]here…disciplinary action is pending as a result of the alcohol related incident, the fitness report is to be submitted *without reference to the* incident and is to be reported in a subsequent DC fitness report." (Pl.'s Second MJAR at 32–35). Nicely also contends the January 25, 2010 Fitness Report was not procedurally correct because it was revised 15 times and the Reviewing Officer failed to adjudicate the factual discrepancies that Nicely raised after it was issued. (*Id.* at 32–33).

The BCNR addressed these contentions and held that Nicely's January 25, 2010 Fitness report "did not contain information prohibited by MCO P1610.7F; the [Reviewing Officer] did not fail to adjudicate the factual discrepancies you raised; and the fitness report was administratively and procedurally correct." (ECF No. 31 at 5). Regarding Nicely's claim that the January 25, 2010 Fitness Report was required to be submitted "without reference to the [alcohol-related] incident," the BCNR addressed this claim and found it to be without merit. Specifically, the BCNR "determined the fitness report was not used to document a disciplinary incident or even a pending disciplinary action," explaining:

> It documented the events that resulted in your relief from duty as the Public Affairs Officer, a high visibility billet in the local community, due to a loss of trust and confidence caused by an incontrovertible incident of arrest be civilian authorities which involved alcohol. The Board noted your transfer to another billet under the supervision of a different RS necessitated a fitness report in accordance with MCO P1610.7F.

(ECF No. 31 at 5). In this regard, the BCNR did not err.[13]

The USMC Performance Evaluation System provides for the periodic reporting, recording, and analysis of the performance and professional character of non-commissioned and commissioned Marine Corps officers.[14] Fitness reports provide a history of a USMC service member's performance and potential, and are governed by MCO P1610.7F. Under this regulation, fitness reports are required, among other occasions, when a Marine Officer transfers to a different department or branch (TR), or there is a change of Reporting Senior (CH). MCO P1610.7F ¶¶ 3003.3, 3004.4.

Here, the USMC removed Nicely from his billet as a PAO and transferred to a different department with a different Reporting Senior, which, under MCO P1610.7F, ¶ 3003.3, triggered the need for a fitness report—*i.e.*, the January 25, 2010 Fitness Report. This fitness report was marked as adverse and stated: "During reporting period, MRO was apprehended by civil

---

[13] Nicely purports to quote the BCNR as stating "[t]here was no legal error concerning the CH Fitness Report." (*Id.*) (emphasis deleted). This statement appears at AR190 rather than AR70 as cited by Nicely. RCFC 52.1(c)(1) provides that motions seeking judgment on the administrative record "must include in [the] motion or supporting memorandum a statement of facts that draws upon and cites to the portions of the administrative record that bear on the issues presented to the court."

[14] All services have a system by which they evaluate performance of their military personnel. MLMCJ § 5:6 The resulting "[e]valuation reports serve as a basis to determine a servicemember's suitability for promotion, schooling, assignments, command and retention." *Id.*

authorities for alcohol related incident. This apprehension and demonstration of poor judgment caused a loss of confidence in abilities to perform duties as PAO." (AR302, 306). Clearly, this fitness report concerned Nicely's removal from his billet as a PAO based on the "alcohol related incident," which "caused a loss of confidence in [his] abilities to perform duties as a PAO." The fitness report did not describe the charges Nicely faced for this incident, civilian or military, only that he was "apprehended" for an "alcohol related incident." As the "alcohol-related incident" was the reason for Nicely' transfer and change of Reporting Senior, it is perfectly logical that the fitness report generated by this event would describe, in general terms, the reason for this action.

While Nicely acknowledges the "event that caused [the January 25, 2010 Fitness Report] was the 'alcohol related incident' that resulted in [Nicely's] apprehension," he ignores MCO P1610.7F ¶¶ 3003.3, 3004.4. (Pl.'s Resp. and Reply at 14). Instead, Nicely alleges that the fitness report fell under paragraph 3009.2, concerning "alcohol-related incidents," and claims that "where disciplinary action is pending as a result of the alcohol related incident, the fitness report is to be submitted without reference to the incident," citing to paragraph 4003c(1) and (4). (*See* Pl's Second MJAR at 33–34; Pl.'s Resp. and Reply at 14).[15]

Paragraph 3009.2 sets forth the procedures for reporting "alcohol-related incidents," and provides, in relevant part:

> a.   <u>Alcohol-Related Incidents</u>.    An alcohol-related incident occurs when the commander confirms, by a preponderance of the evidence, that the willful ingestion of alcohol contributed to an event in which the MRO [Marine Officer] committed a violation of the UCMJ or a comparable civilian offense.

> (1)    If the alcohol-related incident results in disciplinary action, report the incident and subsequent disciplinary action per the provisions of paragraph 4003.6c via DC report.

MCO P1619.7F ¶ 3009.2a. Paragraph 4003c concerns the reporting of disciplinary actions and provides, in relevant part:

> (1)  Disciplinary action is defined as nonjudicial punishment (NJP), court-martial conviction, or civil criminal conviction.

> . . .

> (4)  Report NJP upon a finding of guilt unless the MRO appeals the findings.

> (a)    If the MRO appeals the findings, the RS should delay submitting the DC report until resolution of the appeal.

---

[15] Nicely claims "[t]he RS expressly identifies the 'apprehension' *for suspected DUI* as the triggering event for the relief for cause and the fitness reporting occasion," citing AR83–84, 305–06. (Pl.'s Resp. and Reply at 15). However, no such statement appears on those pages in the Administrative Record and, likewise, the January 25, 2010 Fitness Report does not state that Nicely was apprehended "for suspected DUI." (*See* AR83–84, 305–06).

(b)     If a CH or TR report comes due prior to the resolution of the appeal, the RS should submit the CH or TR report <u>without</u> reference to the NJP.

(c)     If any other reporting occasion comes due prior to the resolution of the appeal, the RS should forego submission of that report and reference the occasion in section I of the pending DC report.

MCO P1619.7F ¶ 4003c.

It must be noted that MCO P1610.7F ¶ 4003c does not state, as Nicely claims, that where disciplinary action is pending as the result of an alcohol related incident, the fitness report is to be submitted "without reference to the incident." (*See* Pl.'s Second MJAR at 34; Pl.'s Resp. and Reply at 16). Rather, ¶ 4003c(4)(b) plainly states: "If a CH or TR report comes due prior to resolution of the appeal, the [Reporting Senior] should submit the CH or TR report without reference to the NJP." Paragraph 4003c(4) relates only to reporting NJPs and, as the United States correctly observes, this provision is inapplicable because Nicely was not "appealing" the NJP when the January 25, 2010 Fitness Report was issued. The NJP proceeding was held on June 9, 2010, long after the January 25, 2010 Fitness Report was issued in April 2010, and Nicely did not appeal the NJP until September 2010. Clearly then, there was no violation of paragraph 4003c.

Although Nicely also relies on paragraph 4012.4(b)(5), this provision similarly provides no support for his argument. Paragraph 4012.4(b)(5) provides, in relevant part:

5.     <u>Unacceptable Comments</u>.     The [rating official] will not comment on the following situations:

a.     Reference to <u>pending</u> nonjudicial punishment, court-martial, civil/criminal action [].

(1)     Discussion of these matters, if the MRO was found innocent or nonculpable, would be premature and prejudicial, thereby unfairly penalizing the Marine.

MCO P1610.7F ¶ 4012.4(b)(5) (emphasis in original).

At the time Nicely received the adverse fitness report in April 2010, neither the civilian proceedings nor the NJP proceedings were "pending," and the final report did not reference either of these proceedings. Although court-martial charges were pending against Nicely in April 2010, the fitness report likewise did not reference the court-martial. All the fitness report stated was "MRO was apprehended by civil authorities for alcohol related incident." As this clearly does not reference any "pending nonjudicial punishment, court-martial, [or] civil/criminal action," the Reporting Senior did not violate paragraph 4012.4(b)(5). Accordingly, the Court finds that the BCNR did not err in concluding that the January 25, 2010 Fitness Report "did not contain information prohibited by MCO P1610.7F."

17

Turning next to Nicely's contention that the Reviewing Officer failed to resolve certain contested issues of fact within the Fitness Report, the BCNR addressed these contentions and found them without merit. (*See* ECF No. 31 at 6). Nicely identifies three factual disputes which he alleges the Reporting Senior failed to adjudicate: (1) alleged violations of MCO P1610.7F ¶ 4003.6; (2) Nicely's claim that he was not detained "overnight"; and (3) the statement by the Reporting Senior that "upon return to military control . . . MRO appeared before me still under the effects of alcohol," which Nicely disputes. (Pl.'s Second MJAR at 36–38). The BCNR "determined that the [Reviewing Officer] did not fail to address, much less fail to resolve, the factual disputes," explaining that Nicely's fitness report statements "did not, with one exception, assert matters of fact but instead asserted legal conclusions." (ECF No. 31 at 6). Regarding the one matter of fact, the BCNR found that the issue to be trivial an "certainly not one requiring the [Reviewing Officer's] adjudication." (*Id.*). The Court finds no error in this determination.

Factual disagreements between a Marine Officer and Reporting Senior are governed by MCO P1610.F ¶ 5004.1, which provides in pertinent part:

> 1. In the event the MRO attaches a statement that disagrees with the [Reporting Senior] as to matters of fact, the [Reviewing Officer] must:
>
>> a. Take action to resolve inconsistencies and disagreements.
>>
>> b. Solicit input from the [Reporting Senior], appropriate staff officers, commanders, and senior enlisted advisors when their comments help to clarify factual differences between the report and the MRO's rebuttal.

Nicely's first claim of unadjudicated fact, concerning violations of MCO P1610.7F ¶ 4003c, asserts a legal conclusion, not a dispute of fact, and is addressed above. Nicely's second claim, that the Reporting Senior's statement that Nicely "appeared before me still under the effects of alcohol," was "unsubstantiated" likewise asserts a legal conclusion, not a dispute of fact. Finally, the Court agrees that Nicely's dispute over whether he was detained "overnight" is trivial at best. This fact was not material to any charges or discipline that Nicely faced but rather, simply provided ancillary background information about Nicely's "apprehension." Because materiality is a factor to be considered by when reviewing a service member's claims, the Court cannot conclude that final resolution of these factual characterizations was required. *See Wade v. United States*, 716 Fed. Appx. 943, 947 (Fed. Cir. 2017) ("On review of an Application for Correction of Naval Records, the Board for Correction of Naval Records ("Board") will not disturb the separations board's findings and conclusions unless the applicant demonstrates the existence of *probable material error or injustice*.") (emphasis added) (citing 32 C.F.R. § 723.3(e)(2)).

Thus, the Court agrees with the BCNR that the Reviewing Officer addressed and resolved all non-trivial factual disputes. To the extent the Reviewing Officer failed to address Nicely's dispute about being detained "overnight," any error in this regard was harmless. *See Wagner v. United States*, 365 F.3d 1358, 1361 (Fed. Cir. 2004); *Boyle v. United* States, 101 Fed. Cl. 592, 601 (2011) ("If an error or injustice is found, and it is determined to *be more substantial than harmless error*, the Secretary of the cognizant branch can change the military record to correct

the error or injustice.") (emphasis added). Accordingly, the BCNR's determination in this regard was not arbitrary, capricious, contrary to law, or unsupported by substantial evidence.

Finally, Nicely argues, without support, that the BCNR erred in finding the January 25, 2010 Fitness Report to be "administratively and procedurally correct," because the report was changed 15 times in response to Nicely's claims of perceived errors. (*See* Pl.'s Second MJAR at 32–33). According to Nicely, "[t]he uniquely error-prone preparation of the report demonstrates the lack of rigor that attended the accuracy of the fitness report, undermined the presumption of regularity in its preparation, and should have informed the BCNR's judgment concerning its preparation and propriety in his [Official Military Personnel File]." (*Id.* at 33). Tellingly, Nicely fails to cite any statute or regulation prohibiting the amendment of fitness reports. Moreover, as Nicely acknowledges, the changes were made "in response to errors identified by [Nicely] in his responses to the fitness report comments." (*Id.* at 32–33). Thus, the reason for the changes were to address Nicely's contentions of error, and as with nearly all governmental documents, each change needed to be forwarded up the chain of command. Consequently, Nicely has failed to establish that the BCNR's determination was arbitrary, capricious, or contrary to law.

### c.  *BCNR's Consideration of Article 15 NJP*

Nicely's last claim of error interweaves a litany of facts and challenges nearly every aspect of his various proceedings. At its root are Nicely's persistent allegations that he never received the benefit of his pre-trial (court-martial) plea agreement, his due process rights were violated by signing a stipulation of fact that he did not believe to be true, his trial counsel "was laboring under a conflict of interest," and the Commanding General issued a factually inaccurate punitive Letter of Reprimand. (Compl. at 7–8, 15–16; Pl.'s Second MJAR at 38–46). According to Nicely, in failing to correct these alleged errors the BCNR acted arbitrarily, capriciously, and contrary to law. (Compl. at 16).

With regard to Nicely's claim that he never received the benefit of his pre-trial agreement, the BCNR addressed this allegation and determined there was no legal error. (ECF No. 31 at 12). The BCNR explained:

> [Y]ou were represented by counsel, had been read your rights, and were on notice that you were not required to make a statement. The Board also noted that you received the whole benefit of the [pre-trial agreement] when your case was adjudicated at NJP vice [General Court Martial], the charges were never again preferred and referred to a court-martial, the applicable statute of limitations has elapsed, and you are no longer subject to court-martial jurisdiction. The Board agreed . . . that the failure to dismiss the charges against you at court-martial did not amount to a material breach of the [pre-trial agreement], as you were not denied the benefit for which you bargained, which was the dismissal of charges before a court-martial. Moreover, withdrawal of charges from a court-martial does not preclude the underlying conduct from forming the basis for later NJP or administrative discharge processing under principles of *res judicata*, which only applied to future judicial action before a court-martial and did not preclude administrative punishment before a tribunal. . . .

19

*Id.*

In this regard, the BCNR's determination was not arbitrary, capricious, contrary to law, or unsupported by substantial evidence. The plea agreement required that the USMC dismiss the court-martial charges with prejudice. Instead, the charges were dismissed "without prejudice." This distinction, of course, can be significant, but not in this instance. Here, the United States correctly observes that Nicely suffered no prejudice from the USMC's failure to heed this term of its agreement. The BCNR determined that the statute of limitations applicable to courts-martial expired and thus, he was no longer subject to prosecution. This determination is valid. At best, the failure to dismiss the court-martial charges with prejudice was harmless. *Wagner*, 365 F.3d at 1361.

With respect to Nicely's claim that he was denied due process by signing the stipulation of fact that he did not believe to be true, the BCNR "did not agree." (ECF No. 31 at 13). The BCNR explained "you were represented by counsel throughout the proceedings and received the benefit of your [pre-trial agreement], which was the avoidance of a court-martial and the possibility of a federal conviction on your record." (*Id.*). Thus, the BCNR "found that [Nicely] did not provide enough evidence outside of conclusory statements to show that [he] did not freely and willingly enter into [the] [pre-trial agreement]." (*Id.*). This determination was not erroneous.

Nicely initially rejected an offer for an NJP in lieu of a court-martial, then requested the offer again after court-martial charges were preferred against him. The Commanding General conditioned the NJP offer on Nicely pleading guilty to specified charges and signing a stipulation of fact. Thereafter, Nicely, on advice of both military and civilian counsel, entered into a formal pre-trial agreement in which the USMC agreed to dismiss the court martial charges, with prejudice, if Nicely agreed to sign a stipulation of fact detailing the circumstances of his arrest and plead guilty at an NJP proceeding to three offenses under the UCMJ. Nicely signed the pre-trial agreement on May 18, 2010, which certified, *inter alia*, that he: (1) voluntarily entered pleas of guilty to the three UCMJ charges; (2) fully understood the offer and agreement; (3) could seek to withdraw his guilty plea at any time before punishment; (4) his counsel fully advised him of the meaning and effect of his guilty plea and he fully understood and comprehended the meaning, effect, and consequences of his plea; and (5) must enter into a reasonable stipulation of fact. In accordance with this agreement, Nicely and his lawyers drafted the stipulation of fact, in which Nicely signed. Then, at the NJP hearing, Nicely stated that: (1) he did not desire a personal representative; (2) he understood his rights; (3) he did not desire trial by court-martial and was willing to accept NJP; (4) he had been fully advised of his legal rights pertaining to the NJP hearing; and (5) he did not have any questions about his rights.

These events provided ample basis for the BCNR to conclude that Nicely was not denied due process. The only evidence that Nicely provided to the contrary was a self-serving declaration stating that his attorney called him in tears and told him that if he did not accept the pre-trial agreement, the attorney would withdraw from the case. (*See* AR267). Not only was this claim uncorroborated by any other evidence, but Nicely requested the NJP before this alleged exchange and afterwards, signed the pre-trial agreement certifying that he entered into the agreement voluntarily. Thus, the BNCR appropriately concluded that Nicely failed to "provide enough evidence outside of conclusory statement to show that [he] did not freely and willingly

enter into [the] [pre-trial agreement]." Moreover, if Nicely did not believe the stipulation of fact to be true, he was free to reject the pre-trial agreement offer and proceed to court-martial. Accordingly, there is no basis for Nicely's claim that he was denied due process.

Nicely also claims that his attorney was conflicted. "[T]he Board determined the evidence did not support [this] contention." (ECF No. 31 at 13). The BCNR explained that "if you felt there was a professional responsibility on the part of your counsel having a conflict of interest, you did not address those concerns in any approved manner," and "there was no factual evidence that you would have been without an attorney if you did not have military counsel." (*Id.*). The BCNR concluded by stating "[a]ll evidence in the case, to include the signed [pre-trial agreement], indicates you were content with your counsel's advice and willingly entered into that agreement." (*Id.*). This determination was not in error.

As explained above, the evidence fully supports the BCNR's conclusion that Nicely freely and voluntarily entered into the pre-trial agreement, and Nicely's uncorroborated, self-serving declaration does not prove otherwise. Assuming *arguendo*, that Nicely's attorney was conflicted, in order to prove a violation of the Sixth Amendment, Nicely would need to first show that his counsel's performance was deficient, and second, that counsel's deficient performance prejudiced his defense. *See Strickland v. United States*, 466 U.S. 668, 687 (1984). Nicely can prove neither.

Principally, Nicely cannot show that his counsel's performance was deficient as Nicely successfully avoided a court-martial and federal conviction. The relative success of the defense indicates reasonably competent representation. *See Flowers v. United States*, 80 Fed. Cl. 201, 221–22 (2008) ("[W]hile courts have rejected the notion that lack of success is indicative of ineffective assistance, the reverse cannot be gainsaid—a relatively successful result suggests reasonably competent representation."). Not only did Nicely avoid the potentially greater consequences of court-martial, his counsel obtained a negotiated settlement at the low end of the range of punishment provided for much less serious Article 15 proceedings. Thus, it appears his counsel was extremely effective and Nicely cannot satisfy the first requirement under *Strickland*. Moreover, Nicely has made no showing whatsoever as to how he was prejudiced by his counsel's allegedly deficient performance. Nicely had two options: proceed to a court-martial or accept NJP and sign a stipulation of fact. Nicely elected the latter option and avoided the potentially greater consequences of a court-martial. It would seem then, that even if Nicely's counsel was deficient, which he was not, Nicely was not prejudiced by this deficiency. Consequently, Nicely has failed to show ineffective assistance of counsel.

Therefore, the Court concludes that the BCNR's determination regarding Nicely's NJP was not arbitrary, capricious, contrary to law, or unsupported by substantial evidence.

### d.   *Nicely Fails to Address Count I of His Complaint*

In Count I of his Complaint, Nicely alleges that the Assistant Secretary of the Navy considered grounds for separation for which Nicely was not provided prior notice and an opportunity to be heard. (*See* Compl. at 14). As the United States notes in its Cross-Motion, Nicely does not address this allegation in his MJAR. (Def.'s Cross-Mot. at 3 n.3). Nicely's also fails to address the issue in his Reply. (*See* ECF No. 62). Similarly, Nicely's First MJAR omits

any discussion of Count I. (*See* ECF No. 45). It is the plaintiff's burden to demonstrate "by cogent and clearly convincing evidence," *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986), that the military board's decision was "arbitrary, capricious, unsupported by substantial evidence, or contrary to law." *Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006).

Here, the BCNR found that Nicely had been properly notified of the grounds for separation. (*See* AR11, 392, 394). As Nicely has provided no evidence whatsoever that the BCNR's decision was arbitrary, capricious, unsupported by substantial evidence, or contrary to law, Nicely has failed to satisfy his burden as to Count I. Thus, judgment on the administrative record must be granted in favor of the United States as to Count I.

## Conclusion

For these reasons, the Court hereby **DENIES** Nicely's Motion for Judgment on the Administrative Record following remand to the Board of Correction for Naval Records and **GRANTS** the United States' Partial Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record. In addition, Nicely's first motion for judgment on the administrative record is **DENIED AS MOOT**. The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/    David A. Tapp
DAVID A. TAPP, Judge